FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2005 AUG -9  AM 9: 22

CLERK OF COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MIRANT CORPORATION, *et al.*,          )
                                       )     CIVIL CASE NO. 4-05CV-479-A
          Plaintiffs,                  )
                                       )
v.                                     )
                                       )
THE SOUTHERN COMPANY,                  )
                                       )
          Defendant.                   )

**MEMORANDUM OF LAW IN SUPPORT
OF THE SOUTHERN COMPANY'S MOTION
TO TRANSFER TO THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

# TABLE OF CONTENTS

**Page**

I.      Preliminary Statement and Summary of Argument ........................................................ 1

II.     Factual Background ................................................................................................... 2

    A.      The Southern Action and the D&O Action.......................................................... 2

    B.      The Witnesses and Documents .............................................................................. 4

    C.      Other Related Litigation Pending in Georgia ..................................................... 12

III.    Argument and Citation of Authority............................................................................ 15

    A.      Transfer of This Action To The Northern District of Georgia Is Amply
        Warranted........................................................................................................... 16

        1.      The Convenience of the Parties and Witnesses and the Interests of
            Justice Weigh Heavily in Favor of Transfer............................................ 16

        2.      The Location of the Parties, Witnesses, and Proof Weighs Heavily
            in Favor of Transfer ................................................................................ 17

            a.      Transferring these Cases to the Northern District of
                Georgia Would Be More Convenient for the Witnesses and
                Less Costly for the Parties ........................................................ 18

            b.      The Vast Majority of Relevant Documents Are Maintained
                in Atlanta.................................................................................. 19

            c.      Southern Cannot Compel the Attendance of Key Witnesses
                in Texas.................................................................................... 20

        3.      Plaintiffs' Choice of Forum Is Entitled to Little Weight ......................... 21

        4.      The Location of Plaintiffs' Counsel and Potential for Delay or
            Prejudice Are Irrelevant......................................................................... 21

        5.      The Public Concerns Also Favor Transfer.............................................. 22

             a.      Georgia Has a Strong Interest in Adjudicating these
                Proceeding Involving Two Locally-Based Corporations ............ 22

            b.      The Northern District of Georgia's Docket Is No More
                 Congested Than This Court's .................................................... 23

            c.      There Is Related Litigation Already Pending in the
                Northern District of Georgia..................................................... 23

    B.      Transfer To The Northern District of Georgia Is Proper Under 28 U.S.C. §
        1404................................................................................................................... 24

IV.     Conclusion ............................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Andrews v. Primus Telecomm. Group, Inc.*, 146 F.Supp.2d 954........................................23

*Casarez v. Burlington Northern/Santa Fe Co.*, 193 F.3d 334 ...........................................17

*Conway v. Lenzing Aktiengesellschaft*, 222 F.Supp.2d 833 ..............................................21

*Feliciano v. Texaco, Inc.*, 144 F.Supp.2d 741 ....................................................18, 19, 20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501................................................................22

*Hanby v. Shell Oil Co.*, 144 F.Supp.2d 673 .............................................................22

*Hoffman v Blaski*, 363 U.S. 335.......................................................................24

*In re: Horseshoe Entertainment*, 337 F.3d 429 ..................................................20, 21, 22

*Independent Stationers, Inc. v. Vaughn*, Case No. IP-99-0127, 2000 WL 1449854 .........15

*JCC Capital Corp. v. Fisher* (In re JCC Capital Corp.), 147 B.R. 349 .............................16

*Lemery v. Ford Motor Co.*, 244 F.Supp.2d 720....................................................18, 19, 20

*McGinnis v. Eli Lilly and Co.*, 181 F.Supp.2d 684..................................................18, 19, 20

*Minka Lighting, Inc. v. Trans Global Imports, Inc.*, Case No. 3:02-CV-2538,
2003 WL 21251684 ......................................................................18, 19, 21

*In re Mirant Corp. Securities Litigation*, Civil Action No. 1:02-CV-1467-RWS.12, 13, 14

*Moto Photo, Inc. v. K.J. Broadhurst Enterprises, Inc.*, Case No. 01-2282, 2003
WL 298799 (N.D. Tex. Feb. 10, 2003)..........................................15, 17, 24

*Ni Fuel Co., Inc. v. Jackson*, 257 B.R. 600.........................................................15

*Purdy v. Munden*, 356 F.Supp.2d 658 ...............................................................23

*Sargent v. Sun Trust Bank, N.A.*, Case No. 3:03-CV-2701, 2004 WL 1630081 ...............21

*In re Spillane*, 884 F.2d 642........................................................................16

*Travelers Indemnity Co. of America v. National Union Fire Insurance Co. of
Pittsburgh*, Case No. 3:02-CV-0585, 2002 WL 1575409 ....................................17, 18

*Van Dusen v. Barrack*, 376 U.S. 612 ................................................................16

*In re Volkswagen A.G.*, 371 F.3d 201 ...........................................16, 18, 22, 24

*Woods v. Southern Company et al.*, Civil Action No. 1:04-CV-1912-RWS ....................14

## STATUTES

28 U.S.C. § 1404 ..............................................................................1, 15, 16, 22, 24

28 U.S.C. § 1409 ...............................................................................................24

28 U.S.C. § 1412 .........................................................................................15, 24

Fed. R. Civ. P. 45(3) ........................................................................................20

O.C.G.A. § 14-2-510(b) ...................................................................................24

Defendant The Southern Company ("Southern") respectfully submits this memorandum of law in support of its motion to transfer this action to the United States District Court for the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. §§ 1404(a) and 1412.

## I.   **PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

Mirant Corporation ("Mirant") and its affiliated debtors and debtors in possession (collectively, "Mirant") filed this adversary proceeding against Southern (the "Southern Action") alleging claims purportedly arising from transactions between these Georgia-based companies. (Ex. A, Southern Compl.)  The Official Committee of Unsecured Creditors of Mirant Corporation (the "Committee") is also a plaintiff and brings its claims on behalf of Mirant and its creditors.  On July 26, 2005, Southern moved to withdraw the reference of the Southern Action. In moving to withdraw the reference, however, Southern advised the Court of its position that the Southern Action should be transferred to the United States District Court for the Northern District of Georgia, Atlanta Division ( the "Northern District of Georgia"), and indicated that it would file the instant motion to transfer.

The Southern Action belongs in Georgia, not Texas.  Although incorporated under Delaware law, both Mirant Corporation and Southern have their corporate offices and principal places of business in Atlanta, Georgia.  The Committee admits by its own allegation that "the largest portion of Creditors in both number of Creditors and value of claims had their domicile or extended their credit to Mirant or its subsidiaries from the State of New York . . . ."  (Ex. A, Southern Compl. ¶ 80 (App. p. 18).)  There is no party with any significant connection to Texas.

The factors a court considers in determining whether to transfer venue overwhelmingly favor transferring venue to the Northern District of Georgia.  Indeed, the Southern Action presents a textbook case for transfer.  The center of gravity for these proceedings is Atlanta.  The

Southern Action arises from decisions made in Atlanta by witnesses who mainly live and/or work in Atlanta. The vast majority of relevant documents are maintained in Atlanta. Indeed, *Mirant* itself successfully moved to transfer securities litigation pending against it in California to the Northern District of Georgia on the grounds that the vast majority of its relevant documents and witnesses were in Atlanta.

By contrast, the Plaintiffs do not allege (nor could they) that any of the operative facts occurred in Texas, that Texas law applies to any of their claims, or that Texas has any connection whatsoever to this dispute. Therefore, the interests of justice, as well as the convenience of the parties and witnesses, strongly support a transfer of this case to the forum: (i) where the underlying transactions occurred; (ii) where the vast majority of witnesses and evidentiary proof are located; (iii) where litigation involving many of the same parties is pending; and (iv) that has the most substantial interest in the resolution of the claims.

## II.   FACTUAL BACKGROUND

### A.   The Southern Action and the D&O Action

The Southern Action concerns transactions that occurred while Mirant[1] was a wholly-owned subsidiary of Southern, including: (i) Mirant's repayment of loans made by Southern to Mirant; (ii) Mirant's use of advances for acquisitions in the 1990s; and (iii) Mirant's payment of dividends to its parent and sole shareholder, Southern. The action also concerns transactions relating to the initial public offering of approximately 19.7% of Mirant's common stock ("the IPO") in late 2000 and the spin-off of Mirant on April 2, 2001 ("the Spin-Off").

Plaintiffs allege that these transactions were carried out solely to enrich Southern, and Mirant was, or was thereby rendered, insolvent and/or undercapitalized, leading to its 2003

---

[1] Mirant was initially incorporated in 1993 as SEI Holdings, Inc., and its name was subsequently changed to Southern Energy, Inc. and later to Mirant Corporation. For purposes of this brief, "Mirant" refers also to Southern Energy, Inc. and its subsidiaries and affiliates.

bankruptcy (although Mirant's first-day affidavit and pending disclosure statement filed in its bankruptcy proceeding are silent about Southern's purported role in Mirant's economic woes). The Southern Action Amended Complaint (the "Complaint") asserts that certain contested transactions were fraudulent conveyances or transfers, or were illegal dividends. According to the Complaint, certain contested transactions were completed when Mirant was insolvent or in the zone of insolvency. As such, plaintiffs allege that Southern induced (or aided and abetted) Mirant in breaching its fiduciary duties to creditors. Also, plaintiffs contend that Southern controlled Mirant such that it was the "alter ego" of Mirant and, accordingly, is liable for Mirant's debts.

One month after filing the Southern Action, the Committee brought another action on behalf of Mirant and its creditors against certain current and former directors and officers of Southern and/or Mirant. (Ex. B (App. pp. 31-51).) The allegations in that case (the "D&O Action") closely mirror the allegations in the Southern Action. There, the Committee alleges that the D&O defendants approved the transactions at issue in the Southern Action for Southern's benefit, and in violation of their duties to Mirant's creditors. The Committee brought the claims against the D&O defendants in a separate proceeding, even though the two actions arise from nearly identical operative facts -- namely, loan repayments, acquisitions, stock redemption, the IPO, the Spin-Off, and dividend payments by Mirant. More specifically, 53 of the 58 factual allegations that purportedly give rise to liability in the Complaint are repeated in the D&O Action complaint. Given the almost identical purported factual basis underlying the two actions (collectively, the "Actions"), Southern is also filing a separate motion to consolidate the Southern Action with the D&O Action.[2]

---

[2] Indeed, nearly all of the substantial factual allegations in the Southern Action are simply repeated verbatim in the D&O Action. (*Compare* Ex. A, Southern Compl. ¶¶ 19-79 (App. pp. 7-18) *with* Ex. B, D&O Compl. ¶¶ 9-65 (App.

Three of the D&O Action defendants -- W.L. Westbrook, H. Allen Franklin, and Elmer Harris (the "Director Defendants") -- moved this Court on July 25, 2005 to withdraw the reference of the D&O Action. Southern understands that the Director Defendants also intend to move to transfer their action to the Northern District of Georgia and to consolidate the Action against them with the Southern Action.

## B.   **The Witnesses and Documents**

The key witnesses likely to testify in these Actions (with a scant few exceptions) live in or near Atlanta, Georgia. The individual defendants in the D&O Action who purportedly authorized many of the transactions at issue in the Southern Action, and are being sued as a result, will be key witnesses in this action. Two of the Director Defendants -- Messrs. Westbrook and Harris -- are Georgia residents. The third Director Defendant, Mr. Harris, is an Alabama resident. (Ex. B, D&O Compl. ¶ 7 (App. p. 33).) None of the three has any significant connections to Texas. In addition, other D&O defendants are also Georgia residents: James A. Ward, Douglas L. Miller, and Stephen A. Wakefield. (*Id.* ¶¶ 8, 9, 13-15 (App. pp. 33-34).) The remaining D&O Action defendants, Gale E. Klappa and Frederick D. Kuester, are residents of Wisconsin, not Texas (*Id.* at ¶¶ 10, 12 (App. p. 33)), and Barney S. Rush is a resident of Maryland. (*Id.* at 11 (App. p. 33).)[3]

There are numerous witnesses in addition to the D&O defendants who will have factual information important for both the prosecution and defense of the Southern Action. Indeed, Southern, through its subsidiary Southern Company Services, Inc. ("SCS"), has over 1,500

---

(continued...)

pp. 33-44).) The same holds true for each of the claims. The Plaintiffs must prove the same threshold facts -- *i.e.*, that the transaction at issue was improper -- *against each set of defendants*. The seminal issue for each action is whether Mirant was insolvent at the time of the alleged fraudulent transfers or illegal dividends -- an issue that will require extensive expert testimony from each side in each case, unless consolidated.

[3] Upon information and belief, as a result of signing a tolling agreement Mr. Miller has been dismissed from the D&O Action. Mr. Rush also has been dismissed from the D&O Action.

employees in Georgia, not including those assigned to such large subsidiaries as Georgia Power Company. (Ex. C., Fleming Decl. ¶ 4 (App. pp. 53-54).)

As shown in the chart below, the vast majority of witnesses are Georgia residents. Indeed, there is only one potentially key witness who resides in Texas: David Lesar, who became a Mirant director shortly after the IPO. (Ex. C, Fleming Decl. ¶¶ 10-11 (App. pp. 55-61).)

In addition to the many Georgia-based current and former Southern or Mirant employee/director witnesses, there are other Georgia-based witnesses. The Complaint alleges that Southern retained Troutman Sanders LLP ("Troutman") "to assist it in executing the IPO and Spin-Off . . . ." (Ex. A, Southern Compl. ¶ 34 (App. p. 9).) Troutman is an Atlanta-based law firm. The lawyers who advised concerning the IPO and Spin-Off mainly worked at Troutman's Atlanta office. (Ex. C, Fleming Decl. ¶ 14 (App. p. 62).) The law firm does not have an office in Texas.

During the time Mirant was a subsidiary of Southern, Arthur Andersen was Mirant's external auditor. The Arthur Andersen office responsible for serving Mirant during that time was the Atlanta, Georgia office. (Ex. D, Andersen Compl. ¶ 7 (App. p. 67).)

The chart below shows who the key witnesses identified thus far are, where they reside or work, and the topics regarding which they may have knowledge.

| Witness | Residence or Work Location | Anticipated Topics |
| --- | --- | --- |
| A. William Dahlberg | Georgia | As present Chairman of Mirant's Board and the Chief Executive Officer and Chairman of Southern from 1995 until just before the 2001 spin-off of Mirant (the "Spin-Off"), Mr. Dahlberg is expected to have knowledge of, among other things: Southern's strategy, motivations and expectations for the Spin-Off; Mirant's overall financial condition before and after the IPO and Spin-Off; and the corporate formalities observed by and between Mirant and Southern. |
| S. Marce Fuller | Georgia | As the CEO and a Director of Mirant since 1999, and having been an Executive Vice President of Southern prior to the IPO, Ms. Fuller is expected to have knowledge of, among other things: the financial condition of Mirant before and after the IPO and Spin-Off; the Stern Stewart & Co. reports; the motivation for the IPO and Spin-Off; and the corporate formalities observed by and between Mirant and Southern. |
| A. D. Correll | Georgia | As a Director of Mirant since the IPO and a Director of Southern before the IPO (when he resigned from the Southern Board), Mr. Correll is expected to have knowledge of, among other things, facts concerning Mirant's overall financial condition at relevant times, corporate governance practices at both Mirant and Southern, and the IPO and Spin-Off. |
| Douglas L. Miller | Georgia | From his role as Senior Vice President and General Counsel of Mirant since 1999, Mr. Miller is expected to have knowledge concerning, among other things: (i) planning for the IPO and Spin-Off; (ii) Mirant's advance knowledge of the IPO and Spin-Off; (iii) the documentation of the IPO and Spin-Off; (iv) the Series B Redemption; and (v) the corporate formalities observed by and between Mirant and Southern. |
| Elizabeth B. Chandler | Georgia | As Vice President and Corporate Secretary and an in-house lawyer at Mirant before and after the IPO and Spin-Off, Ms. Chandler is expected to have knowledge relevant to the same topics listed for Mirant's General Counsel, Mr. Miller. |

| J. William Holden | Georgia | As a Vice President Finance and key finance executive at Mirant, before and after the IPO and Spin-Off, Mr. Holden is expected to have knowledge about Mirant's financial condition at relevant times, and the adverse impact of external market and economic factors on Mirant after the IPO. |
|---|---|---|
| Vance Booker | Georgia | As Senior Vice President, Administration and Internal Affairs of Mirant and a member of Mirant's Management Council before and after the IPO and Spin-Off, Mr. Booker is expected to have knowledge of facts surrounding the IPO and Spin-Off, including the negotiation and development of the Separation Agreements. |
| Laura Patterson | Georgia | As a senior manager of Mirant's accounting department before and after the IPO and Spin-Off, Ms. Patterson is expected to have knowledge about, among other things, Mirant's accounting, and the IPO and Spin-Off. |
| C. B. Harreld | Georgia | Having held several executive positions at Mirant prior to the IPO and Spin-Off, including controller of Mirant's North Americas Group, Mr. Harreld is expected to have knowledge of Mirant's financial condition before the Spin-Off, accounting issues related to the allegations in the Amended Complaint, and matters bearing on the "Alter Ego" Count of the Amended Complaint. |
| Andrew J. Dearman | Georgia | As Senior Vice President and Chief Technical Officer of Mirant and a member of Mirant's management council until just prior to the IPO and Spin-Off, Mr. Dearman is expected to have knowledge of Mirant's financial condition prior to the Spin-Off, the reasons for the IPO and Spin-Off, Mirant's knowledge of the IPO and Spin-Off and facts relevant to the "Alter Ego" allegation. |
| Louise North | Georgia | As Manager Corporate Finance before and after the IPO and Spin-Off, Ms. North is expected to have knowledge of Mirant's financial condition and the transactions complained of in the Amended Complaint. |

| William A. Maner, III | Georgia | As Mirant's Vice President (Finance) before and after the IPO and Spin-Off, Mr. Maner had day to day responsibility at Mirant for the implementation and execution of Project Olympus and is expected to have information pertaining to the IPO and Spin-Off, including, among other things, the documentation of those transactions, and the hiring and utilization of outside financial and legal professionals for the transactions, as well as knowledge of Mirant's financial condition, Mirant's knowledge of the IPO and Spin-Off, and the transfers complained of in the Amended Complaint. |
| --- | --- | --- |
| Raymond D. Hill | Georgia | As Executive Vice President and Mirant's Chief Financial Officer before and after the Spin-Off, Mr. Hill is expected to have knowledge of, among other things, all matters complained of in the Amended Complaint. |
| James A. Ward | Georgia | As Senior Vice President and Controller of Mirant before and after the IPO, Mr. Ward is expected to have knowledge of all matters complained of in the Amended Complaint. |
| Stephen A. Wakefield | Georgia | From his role as General Counsel of Southern, before and after the IPO and Spin-Off, Mr. Wakefield is expected to have knowledge of, among other things: (i) planning for the IPO and Spin-Off; (ii) Mirant's advance knowledge of the IPO and Spin-Off; (iii) the documentation of the IPO and Spin-Off; (iv) Troutman Sanders' role in the IPO and Spin-Off; (v) the dividends alleged in the Amended Complaint; and (vi) the corporate formalities observed by and between Mirant and Southern. |
| James C. Fleming | Georgia | As Vice President and Associate General Counsel of SCS, before and after the IPO and Spin-Off, Mr. Fleming is expected to have knowledge of, among other things: (i) planning for the IPO and Spin-Off; (ii) Mirant's advance knowledge of the IPO and Spin-Off; (iii) the documentation of the IPO and Spin-Off; (iv) the Series B Redemption; (v) the role of Troutman Sanders in the IPO and Spin-Off; (vi) the dividends alleged in the Amended Complaint; and (vii) the corporate formalities observed by and between Mirant and Southern. |

| Ann P. Daiss | Georgia | As Accounting Director and Assistant Controller of SCS before and after the IPO and Spin-Off, Ms. Daiss' knowledge is expected to pertain to the accounting for Southern's advances to Mirant, Mirant's repayments and dividends, and accounting facts bearing on the "Alter Ego" Count of the Amended Complaint. |
| --- | --- | --- |
| W. Dean Hudson | Georgia | As Vice President and Controller of Southern before and after the IPO and Spin-Off, Mr. Hudson is expected to have knowledge similar to that of Ms. Daiss. |
| Earl C. Long | Georgia | As Assistant Treasurer of SCS before and after the IPO and Spin-Off, Mr. Long is expected to have knowledge of facts about Southern's Treasury Department's treatment of advances, repayment of advances, dividends and capital contributions. |
| Jeffrey Friedlein | Georgia | As a Financial Analyst of SCS, before and after the IPO and Spin-Off, Mr. Friedlein is expected to have knowledge similar to Mr. Long's. |
| Mark Lantrip | Georgia | As Director, Financial Planning and Analysis of SCS, before and after the IPO and Spin-Off, Mr. Lantrip was involved in financial planning and analysis for the IPO and Spin-Off and, therefore, is expected to have knowledge about those transactions and the parties' preparation for them. He also was involved in financial planning and analysis related to advances, dividends and capital contributions. In addition, Mr. Lantrip should have knowledge of facts bearing on Mirant's financial condition at relevant times. |
| Dana Munson | Georgia | As Assistant to Southern's Chief Strategic Officer prior to the IPO and Spin-Off, Ms. Munson is expected to have knowledge of strategic and financial planning and analysis for the IPO and Spin-Off, and of communications with financial institutions in connection with those transactions. |
| Dewey Robinson | Georgia | As a Financial Accounting Principal of SCS, before and after the IPO and Spin-Off, who interfaced with Mirant's accounting personnel leading up to the Spin-Off, Mr. Robinson is expected to have knowledge of accounting facts about the advances, dividends and capital contributions, and of financial reporting before the Spin-Off. |

| Subi George | Georgia | Mr. George was the Stern Stewart & Co staff member with day to day responsibility for the consulting work referenced in the Amended Complaint and is expected to have knowledge about, among other things, the reports prepared by Stern Stewart & Co. referenced in the Amended Complaint. |
|---|---|---|
| W. L. Westbrook | Georgia | As a former Director of Mirant and the former Chief Financial Officer of Southern, Mr. Westbrook is expected to have knowledge of matters complained of in the Amended Complaint. |
| H. Allen Franklin | Georgia | As a former director of Mirant and the former Chief Executive Officer and Chairman of Southern, Mr. Franklin is expected to have knowledge of matters complained of in the Amended Complaint. |
| Elmer B. Harris | Crowell, Alabama | As a former director of Mirant and Executive Vice President of Southern, Mr. Harris is expected to have knowledge relevant to the allegations in the Amended Complaint about the IPO, the Spin-Off, and Mirant's financial condition within the relevant window before and after the Spin-Off. |
| John T. W. Mercer | Georgia | Mr. Mercer, a partner with Troutman Sanders, was lead outside counsel for the IPO and Spin-Off. |
| D. G. Presten, III | Georgia | Mr. Presten, a partner with Troutman Sanders, assisted Mr. Mercer in connection with the IPO and Spin-Off. |
| Robert P. Edwards, Jr. | Georgia | Mr. Edwards, a partner with Troutman Sanders, had overall responsibility for regulatory aspects of the IPO and Spin-Off. |
| John D. McLanahan | Georgia | Mr. McLanahan, a partner at Troutman Sanders, was responsible for Public Utility Holding Company Act approval for all matters referenced in the Amended Complaint. |
| Stanley H. Hackett | Georgia | Mr. Hackett, a partner at Troutman Sanders, advised regarding tax aspects of the IPO and Spin-Off. |
| Hugh M. Davenport | Georgia | Mr. Davenport, a partner at Troutman Sanders until late 2000, and Vice President and Assistant General Counsel at Mirant thereafter, is familiar with certain aspects of the IPO and the Spin-Off and corporate governance practices at Southern and Mirant before and after the IPO and Spin-Off. |
| Mark Bell | Georgia | As the former Arthur Andersen engagement partner for Mirant's audit work, Mr. Bell is expected to have knowledge about, among other things, Mirant's financial condition before the IPO and Spin-Off. |

| Robert Powell | Georgia | Mr. Powell was the manager for Arthur Andersen's audit engagement for Mirant and is expected to have information about Mirant's financial condition before the IPO and Spin-Off. |
|---|---|---|
| Thomas G. Boren | Georgia and Florida | Mr. Boren divides his time between Georgia and Florida.  As Mirant's Chief Executive Officer and Chairman from 1992 until July, 1999, he is expected to have knowledge related to Mirant's pre-July 1999 financial condition and the pre-July 1999 advances, and other pre-July 1999 events alleged in the Amended Complaint.  He also will have knowledge of intercompany relations issues relevant to the "Alter Ego" Count in the Amended Complaint. |
| David J. Lesar | Texas | Mr. Lesar, like Mr. Correll, was a Southern Director before becoming a Mirant Director at the time of the IPO.  He is expected to have knowledge about, among other things, the IPO and Spin-Off and corporate governance practices at both Mirant and Southern. |
| Gale E. Klappa | Wisconsin | As Chief Strategic Officer of Southern prior to the IPO and Spin-Off, Mr. Klappa is expected to have knowledge about Southern's strategy and motivations for the IPO and Spin-Off, as well as about Mirant's financial condition at the times of those transactions.  As CEO of Mirant's North Americas Group during late 1998 and part of 1999, he is expected to have knowledge about certain of Mirant's acquisitions referenced in the Amended Complaint. |
| Allen L. Leverett | Wisconsin | As Financial Vice President of SCS before and after the IPO and Spin-Off, Mr. Leverett is expected to have knowledge relevant to the allegations in the Amended Complaint about the IPO, the Spin-Off, advances and Stern Stewart & Co. |

(Ex. C, Fleming Decl. ¶ 10 (App. pp. 55-61).)

The firms of Goldman Sachs, Morgan Stanley and certain credit rating agencies may

have relevant and important information relating to the Actions.  Upon information and belief, no

relevant witnesses employed by these entities are located in Texas.

In addition to the witnesses residing in Atlanta, the events alleged or described in the

Complaint occurred, or are alleged to have occurred, almost entirely in Atlanta.  (Ex. C, Fleming

Decl. ¶ 9 (App. pp. 54-55).)  For example, during all relevant time periods, the Board of

Directors for Southern met in Atlanta. Southern's directors have never held a board meeting in

Texas. Southern maintains its meeting minutes for the Board of Directors in Atlanta. The Board

of Directors for Mirant also met in Atlanta and never held a board meeting in Texas. (*Id.* ¶ 13

(App. p. 62).)

In addition to the many individuals living and/or working in the Atlanta area, many

thousands of potentially relevant documents are located in Atlanta. Southern's main document

storage location is at Adams Data Management Company, 1846 Montreal Road, Tucker,

Georgia, which is in the Atlanta metropolitan area. Southern stores approximately 20,000 boxes

of documents there. Such boxes include risk management, corporate accounting and financial

documents. (Ex. C, Fleming Decl. ¶ 15 (App. p. 62).) Southern's subsidiary, SCS, has

approximately 20,000 boxes of engineering design, contract and projection documents stored at

CRC Warehouse, First Street, Birmingham, Alabama. (*Id.*) Southern has no repository for

documents in Texas. (*Id.* ¶ 16 (App. p. 62).)

## C.    Other Related Litigation Pending in Georgia

Significant litigation involving many of the same parties is already pending in the

Northern District of Georgia. Specifically, multiple shareholder actions were filed in California

and Georgia against Mirant and four of its officers -- one of whom, James A. Ward, is also a

defendant in the D&O Action -- alleging violations of securities law. *Mirant* itself took the

position that that litigation should be transferred to the Northern District of Georgia for the

convenience of witnesses and in the interests of justice. More specifically, in support of Mirant's

motion to transfer the securities litigation to the Northern District of Georgia, Mirant submitted

the declaration of Hugh Davenport, Mirant's Vice President and Assistant General Counsel

("Davenport Decl.") (Ex. E (App. pp. 115-116).) Mr. Davenport testified that "[t]o the extent

that there are witnesses and/or documents relevant to the above referenced [securities] action, the

vast majority are located in Atlanta." (*Id.* ¶ 4 (App. p. 116).) He further stated that: "Mirant's financial statements and filings with the Securities Exchange Commission were all prepared in Atlanta, Georgia," where its headquarters and corporate finance department were located. (*Id.* ¶¶ 2, 5 (App. p. 116).)

Not surprisingly, Mirant's motion was successful. The California cases were transferred and consolidated with the pending Georgia cases into a single action styled, *In re Mirant Corp. Securities Litig.*, Civil Action No. 1:02-CV-1467-RWS (N.D. Ga.) (the "Securities Litigation").

In November 2002, the Securities Litigation plaintiffs amended their consolidated complaint to add claims for violations of Sections 11 and 15 of the Securities Act of 1933, as amended, and to add defendants. The plaintiffs added as defendants, among others, Southern and four Mirant directors, three of whom -- H. Allen Franklin, Elmer B. Harris, and W.L. Westbrook -- are also defendants in the D&O Action. The Securities Litigation plaintiffs alleged that the directors were liable as signatories to Mirant's IPO prospectus.

On July 14, 2003, the Northern District of Georgia entered a 52-page order granting in part the defendants' motions to dismiss. Thereafter, the Securities Litigation has been stayed during the pendency of the chapter 11 cases, although the stay was partially modified to allow for document discovery. There likely will be overlapping discovery in the Securities Litigation, on the one hand, and the Southern and D&O Actions, on the other. Indeed, the Securities Litigation plaintiffs recently subpoenaed documents, including "[a] duplicate copy set of all documents that the United States Bankruptcy Court of the Northern District of Texas has ordered Troutman Sanders LLP to produce to Mirant in its June 7, 2005 Order . . . ." (*In re Mirant Corporation Securities Litigation*, Civil Action No. 1:02-CV-1467-RWS (N.D. Ga.), Notice of Subpoena (Ex. F (App. pp. 117-119).)

Furthermore, in 2004, a putative class action alleging violations of the Employee Retirement Income Security Act was filed in the Northern District of Georgia against, among others, Southern and Director Defendants Harris and Franklin (the "Southern ERISA Litigation"). The Southern ERISA Litigation, captioned *Woods v. Southern Company et al.*, Civil Action No. 1:04-CV-1912-RWS (N.D. Ga.), asserts claims in connection with Mirant stock held in the accounts of some, but not all, of the participants in The Southern Company Employee Savings Plan as a result of the dividend of Mirant stock to Southern shareholders in the Spin-Off on April 2, 2001.

Another related case currently pending in the Northern District of Georgia is a putative ERISA class action filed in 2003 against Mirant and certain of its officers, directors and employees (the "Mirant ERISA Litigation"). That action, which is captioned *In re Mirant Corporation ERISA Litigation*, Civil Action No. 1:03-CV-1027-RWS (N.D. Ga.), asserts ERISA claims in connection with the Mirant stock held in Mirant's employee benefit plans.

Finally, as further evidence that the Actions belong in Georgia, the Committee, on July 12, 2005, filed on behalf of Mirant an action against Arthur Andersen in the State Court in Fulton County, Georgia, the county where the Atlanta Division of the Northern District of Georgia is located. The Committee alleged on behalf of Mirant that, among other things, Andersen was negligent in its audit of Mirant financials giving it "clean" audit opinions that "were riddled with error." (Ex. D, Andersen Compl. ¶ 76 (App. p. 90).) "Mirant . . . relied on the opinions issued by Andersen related to Mirant" (*Id.* ¶ 29 (App. p. 74)), and certain of these incorrect financial reports were "incorporated into the IPO." (*Id.* ¶ 77 (App. pp. 90-91).)

According to the Arthur Andersen complaint, "the audit opinions described in this Complaint issued by Arthur Andersen LLP were issued by Arthur Andersen LLP to Mirant in

Fulton County, Georgia, and the contracts at issue were made, entered into and breached by Arthur Andersen LLP in Fulton County, Georgia." (*Id.* ¶ 7 (App. p. 67).)

Given that both Mirant and Southern are Georgia-based companies, it should come as little surprise that the Securities Litigation, the Southern ERISA Litigation and the Mirant ERISA Litigation are all pending in the Northern District of Georgia, and the Arthur Andersen complaint was brought in the Fulton County State Court in Georgia. The transactions that serve as the basis of those actions, as well as the Southern Action and D&O Action, took place in Georgia, and the evidence necessary to prosecute and defend all of this litigation, both in terms of documents and witnesses, resides largely in Georgia. It is for these reasons that Southern requests that the Southern Action be transferred to the Northern District of Georgia.

## III.   ARGUMENT AND CITATION OF AUTHORITY

Two different federal statutes dictate transfer of venue to the Northern District of Georgia. 28 U.S.C. § 1412 provides: "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." In addition, 28 U.S.C. 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[4]

Despite the different statutes, the factors courts consider in determining a motion under section 1404(a) are the same as those considered in deciding a motion under section 1412. *In re*

---

[4] Courts have taken conflicting positions on whether section 1412 applies to "related to" proceedings. *Compare Moto Photo, Inc. v. K.J. Broadhurst Enters., Inc.*, Case No. 01-2282, 2003 WL 298799, *2 (N.D. Tex. Feb. 10, 2003) (Ex. I) ("[Section 1412], by its terms, applies only to core bankruptcy proceeding where federal jurisdiction arises 'under title 11.'") (citations omitted) and *Ni Fuel Co., Inc. v. Jackson*, 257 B.R. 600, 622-23 (N.D. Ok. 2000) (citing and analyzing other bankruptcy court decisions determining that section 1404, rather than section 1412, governed venue change for "related to" proceedings based upon the text of section 1412 and its statutory predecessor, section 1475) *with Independent Stationers, Inc. v. Vaughn*, Case No. IP-99-0127, 2000 WL 1449854, *2 (S.D. Ind. Jan. 3, 2000) (Ex. L) ("Change of venue for proceeding related to a case under title 11 is governed by 28 U.S.C. § 1412"). Nonetheless, both statutes call for transfer of this action.

*Spillane*, 884 F.2d 642, 645 n.4 (1st Cir. 1989) (stating there is "little reason for distinguishing

between the two statutes"); *JCC Capital Corp. v. Fisher (In re JCC Capital Corp.)*, 147 B.R.

349, 356 (Bankr. S.D.N.Y. 1992) ("The factors courts consider in determining a motion under

section 1404(a) are the same as those considered in deciding a motion under section 1412.").

The essential difference between the two is that section 1404 permits transfer of venue only to a

venue in which the suit originally could have been brought (which is met in this case, as

discussed in Section B below).  Section 1412 contains no such restriction.[5]  Based on either

statute, this Court should transfer venue to the Northern District of Georgia.

**A.**     **Transfer of This Action To The Northern District of Georgia Is Amply Warranted**

      **1.**     **The Convenience of the Parties and Witnesses and the Interests of Justice Weigh Heavily in Favor of Transfer**

The purpose of § 1404(a) is "to prevent the waste of time, energy and money and to

protect litigants, witnesses and the public against unnecessary inconvenience and expense . . . ."

*Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks omitted.)  The Fifth

Circuit in *In re Volkswagen A.G.,* 371 F.3d 201 (5th Cir. 2004), set forth the following "private"

and "public" interest factors to consider in determining whether transfer is appropriate:

**Private concerns:**

- the availability and convenience of the witnesses and parties;

- the relative ease of access to source of proof;

- the availability of process to compel the attendance of unwilling witnesses;

- the cost of obtaining attendance of witnesses;

---

[5] In addition, the text of section 1404 seems to require that the movant show that transfer is warranted "in the interest of justice" and "for the convenience of parties and witnesses," whereas section 1412 is in the disjunctive making transferability appropriate if it is "in the interest of justice" or "for the convenience of the parties."  The case law does not appear to consider this distinction, however.

- the place of the alleged wrong;

- the plaintiff's right to choose its forum; and

- the possibility of delay and prejudice if the case is transferred.

**Public concerns:**

- the local interest in having localized interests decided at home;

- The administrative difficulties flowing from court congestion;

- the familiarity of the forum with the law that will govern the case; and

- the avoidance of unnecessary problems of conflict of law in the application of foreign law.

*See id.* (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)); *Travelers Indem. Co. of Am. v. National Union Fire Ins. Co. of Pittsburgh*, Case No. 3:02-CV-0585, 2002 WL 1575409, *2 (N.D. Tex. July 16, 2002). (Ex. H (App. pp. 124-127).)  In addition, courts have noted that transfer is in the "interest of justice" where "related cases involving the same issues are pending in another court." *Moto Photo, Inc. v. K.J. Broadhurst Enters., Inc.*, Case No. 01-2282, 2003 WL 298799, *4 (N.D. Tex. Feb. 10, 2003). (Ex. I (App. pp. 128-131).)

## 2. The Location of the Parties, Witnesses, and Proof Weighs Heavily in Favor of Transfer

The first four private interest factors listed above turn on where the parties, witnesses, and relevant documents are located. *See Casarez v. Burlington Northern/Santa Fe Co.*, 193 F.3d 334, 339 (5th Cir. 1999), *reh'g and reh'g en banc denied*, 201 F.3d 383 (5th Cir. 2000) (affirming transfer when the majority of fact witnesses lived closer to Fort Worth than to El Paso, defendant was headquartered in Fort Worth, and relevant files were maintained in Fort Worth).  These factors strongly favor -- indeed almost demand -- transfer to the Northern District of Georgia.

a.    **Transferring these Cases to the Northern District of Georgia Would
Be More Convenient for the Witnesses and Less Costly for the Parties**

The convenience of the witnesses -- especially non-party witnesses -- is often regarded as the most important factor to be considered in deciding a motion to transfer venue. *Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 730 (S.D. Tex. 2002); *McGinnis v. Eli Lilly and Co.*, 181 F. Supp. 2d 684, 687 (S.D. Tex. 2002); *Feliciano v. Texaco, Inc.*, 144 F. Supp. 2d 741, 742 (S.D. Tex. 2001); *Minka Lighting, Inc. v. Trans Global Imports, Inc.*, Case No. 3:02-CV-2538, 2003 WL 21251684, at *8 (Ex. J (App. pp. 132-136)); *Travelers Indem.*, 2002 WL 1575409, at *2. (Ex. H (App. pp. 124-127).)

In *Volkswagen*, the Fifth Circuit granted mandamus relief because the district court failed to properly consider the convenience of the fact witnesses who lived 400 miles from the trial court. 371 F.3d at 204-05. The Fifth Circuit reasoned that:

> When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled. Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment.

*Id.*

Numerous key witnesses live and work in Atlanta, while only one potentially important witness lives in Texas. The sheer cost associated with bringing witnesses halfway across the country -- airline tickets, hotel rooms, meals, etc. -- weighs in favor of transferring these proceedings to the Northern District of Georgia. Transferring these proceedings will also have the added benefit of providing the court and the parties with greater flexibility in calling witnesses at trial. More significantly, "those witnesses who are willing to testify at trial without subpoena would be grossly inconvenienced by having to travel 800 miles" to Fort Worth, instead

of travelling a few miles to the courthouse in Atlanta. *See McGinnis*, 181 F. Supp. 2d at 689.

The convenience of *witnesses* plainly favors transfer here. *See Lemery,* 244 F. Supp. 2d at 731

(transferring to New York where witnesses lived); *McGinnis*, 181 F. Supp. 2d at 689

(transferring to North Carolina where witnesses lived); *Feliciano*, 144 F. Supp. 2d 741 at 742-43

(transferring to Louisiana where witnesses lived).

In addition, there can be no doubt that the convenience of the *parties* factor favors

transfer. The Northern District of Georgia is the most convenient forum for Southern and

Mirant. Indeed, Mirant itself argued that the California securities litigation should be transferred

to the Northern District of Georgia on the grounds of convenience. (*See* Ex. E, Davenport Decl.

(App. pp. 115-116)) The Court should reach the "common sense conclusion" that "it would be

more convenient and economical" for Southern and Mirant "to litigate this matter in their home

district rather than  halfway across the country in the Northern District of Texas." *Minka*, 2003

WL 21251684 at *2. (Ex. J.)

### b.    The Vast Majority of Relevant Documents Are Maintained in Atlanta

The fact that Southern and Mirant are both headquartered in Atlanta has particular

bearing on the factor of "ease of access to sources of proof." *See Minka*, 2003 WL 21251684 at

*2 (rejecting argument that ease of proof would be served by examining regional sales records in

Dallas, rather than national records maintained at plaintiff's headquarters in California). (Ex. J

(App. pp. 132-136).) This is so because a corporation's headquarters is typically the location

where its documents are maintained. (Ex. C, Fleming Decl. ¶ 15 (App. p. 62); Ex. E, Davenport

Decl. ¶ 4 (App. p. 116).)

In *In re: Horseshoe Entertainment*, 337 F.3d 429 (5th Cir. 2003), the Fifth Circuit

granted mandamus relief because, among other things, the district court "erred in not giving

significance to the factor regarding the location of books and records," which the defendant

maintained in Shreveport, Louisiana. *Id.* at 434 (internal quotation marks omitted).  As the evidentiary proof relevant to these proceedings is mainly in Atlanta, transfer is appropriate.

### c.    Southern Cannot Compel the Attendance of Key Witnesses in Texas

If these proceedings were tried in Texas, Southern would potentially be denied the opportunity to present live testimony at trial of key witnesses because most of these witnesses live in Atlanta, far beyond the Court's subpoena power.  FED. R. CIV. P. 45(3)(A)(ii) (trial court shall quash a subpoena if it requires a person, who is not a party or officer of a party, to travel more than 100 miles to attend trial, unless the person resides in-state).

Furthermore, Southern lacks even informal control over numerous key witnesses -- including certain current Mirant employees, former Mirant decision-makers, former directors of Mirant, former Southern employees, and the Arthur Andersen accountants who audited Mirant's financial records.  Southern cannot compel them to testify in Texas.  *See Feliciano*, 144 F. Supp. 2d at 743 (transferring where the only eyewitness was no longer employed by defendant and was outside the court's subpoena power).

While plaintiffs may argue that Southern can simply present the same evidence by reading depositions into the record, such a procedure would result in unfair prejudice and would deny the fact-finder the opportunity to evaluate the demeanors of the witnesses.  *See Lemery*, 244 F. Supp. 2d at 731 ("[F]orcing Ford to rely on medical records or deposition testimony to present its case on causation will likely result in unfair prejudice."); *McGinnis*, 181 F. Supp. 2d at 689 ("[R]etention of this case would conceivably deprive Lilly of the opportunity to present any live testimony whatsoever -- a result this Court is unwilling to impose.").  Because the Northern District of Georgia has subpoena power over most of the key witnesses, unlike this Court, the proceedings should be transferred.

### 3.     Plaintiffs' Choice of Forum Is Entitled to Little Weight

A plaintiff's choice of forum is entitled to "some deference." *Minka Lighting, Inc. v.*

*Trans Globe Imports, Inc.*, Case No. 3:02-CV-2538, 2003 WL 21251684, *1 (N.D. Tex. May 23,

2003).  (Ex. J (App. pp. 132-136).)  Nevertheless, "it is clear under Fifth Circuit precedent that

the plaintiff's choice of forum . . . *is neither conclusive nor determinative.*"  *Horseshoe*

*Entertainment*, 337 F.3d at 434 (emphasis added).  Where, as here, virtually all of the operative

facts occurred in Georgia, plaintiffs' choice of forum has reduced significance.  *Sargent v. Sun*

*Trust Bank, N.A.*, Case No. 3:03-CV-2701, 2004 WL 1630081, *2 (N.D. Tex. July 20, 2004)

("[T]he plaintiff's choice of forum has reduced significance where most of the operative facts

occurred outside the district.") (Ex. K); *Minka*, 2003 WL 21251684 at *1 (same).  (Ex. J (App.

pp. 132-136).)

Moreover, plaintiffs' choice of forum should be accorded less weight because Texas is

not the home forum for either Mirant or the creditors that make up the Committee.  *Minka*, 2003

WL 21251684 at *1.  (Ex. J (App. pp. 132-136).)  Given the fact that Texas has no factual nexus

to this case and none of the parties are Texas citizens, plaintiffs' choice of forum "carries very

little significance if other factors weigh in favor of transfer" -- which they do.  *Conway v.*

*Lenzing Aktiengesellschaft*, 222 F. Supp. 2d 833, 834 (E.D. Tex. 2002).

### 4.     The Location of Plaintiffs' Counsel and Potential for Delay or Prejudice Are Irrelevant

The location of a party's counsel "is irrelevant and improper for consideration in

determining the question of transfer of venue."  *Horseshoe Entertainment*, 337 F.3d at 434.

Indeed, the word "counsel" does not appear anywhere in § 1404 as a factor to be considered.

*Volkswagen*, 371 F.3d at 206.[6]

Likewise, the factors of prejudice and delay are not relevant to this case at this stage of

the proceedings.  The Complaint was filed only seven weeks ago and, other than a stipulation

extending Southern's response date, the only pleading that has been filed is the motion to

withdraw the reference.  While there may be "rare and special circumstances" in which prejudice

and delay are relevant, such circumstances must be established by clear and convincing

evidence, which is not present here.  *Horseshoe Entertainment*, 337 F.3d at 434.  It would be

error, therefore, to give weight to this factor based on speculation that someone might somehow

be prejudiced or delayed if the case is transferred.  *See id.* (holding that the Middle District erred

in giving weight to the possibility of prejudice and delay, without clear and convincing

evidence).

**5.      The Public Concerns Also Favor Transfer**

      **a.      Georgia Has a Strong Interest in Adjudicating these Proceeding
Involving Two Locally-Based Corporations**

The State of Texas has no local interest in adjudicating this dispute.  Neither Mirant nor

Southern is located in, or has significant contacts with, Fort Worth.  As such, "it would be unfair

to burden the citizens" of Fort Worth with serving as jurors[7] for these disputes.  *Hanby v. Shell

Oil Co.*, 144 F. Supp. 2d 673, 679 (E.D. Tex. 2001).  "Jury duty is a burden that ought not to be

imposed upon the people of a community which has no relation to the litigation."  *Gulf Oil Corp.

v. Gilbert*, 330 U.S. 501, 508-09 (1947).  Instead, jurors' time would be better spent hearing

---

[6] A court commits reversible error by considering where a party's attorneys are located. *See id.* ("We also conclude that the Eastern District Court reversibly erred in considering a factor that is not part of the § 1404(a) analysis. Specifically, in its order the district court considers that counsel for both parties are located in Dallas, Texas.").

[7] In its motion to withdraw the reference, Southern stated that it intends to seek a jury trial as to some of the claims against it.

cases that are not solely connected to another district. *Purdy v. Munden*, 356 F. Supp. 2d 658, 660 (E.D. Tex. 2005).

### b. The Northern District of Georgia's Docket Is No More Congested Than This Court's

Both the Northern District of Texas and the Northern District of Georgia have comparable caseloads that are decided in a comparable length of time. As of September 30, 2004, judges in this Court had 391 pending civil cases per judge, while the Northern District of Georgia judges had 423 cases. FEDERAL COURT MANAGEMENT STATISTICS 2004, "Texas Northern" and "Georgia Northern." (Ex. G (App. pp. 120-123.) Similarly, the median times for civil cases to go from filing to trial were 21.7 months in this Court, and 22 months in the Northern District of Georgia. *Id.* The balance tilts in favor of transfer, however, once the Court considers the lack of any factual nexus between these proceedings and the State of Texas. As numerous Texas district courts have found, a party's choice to file suit in a forum that has no connection to the underlying events imposes an "enormous hardship" and congests the dockets of an already-busy court system. *See, e.g., Andrews v. Primus Telecomm. Group, Inc.*, 146 F. Supp. 2d 954, 954-55 (S.D. Tex. 2001). Here, Texas has no connection to these proceedings, and plaintiffs could have just as easily filed their claims in the Northern District of Georgia where the events occurred, the evidence is located, and most of the parties and witnesses live.

### c. There Is Related Litigation Already Pending in the Northern District of Georgia

Related litigation involving Mirant, Southern, and many of the D&O Action defendants is already pending in the Northern District of Georgia. That court has assigned these related cases to the same judge for more efficient adjudication. The interests of justice would be served by transferring these proceedings to the court where "related cases involving the same issues are

pending." *Moto Photo*, 2003 WL 298799 at \*5. (Ex. I (App. pp. 128-131).)[8]

## B.   Transfer To The Northern District of Georgia Is Proper Under 28 U.S.C. § 1404

As discussed above, under § 1404(a), a court may only transfer a case to a venue where

plaintiff had the right to sue in the first place. *In re Volkswagen A.G.*, 371 F.3d 201, 203 (5th

Cir. 2004); *Hoffman v Blaski*, 363 U.S. 335, 342-43 (1960).[9] The Northern District of Georgia

satisfies section 1404(a)'s requirement that the transferee court be a venue in which the suit

"might have been brought."

A trustee may bring a proceeding arising in or related to a case under title 11 in the

district "where the State or Federal court sits in which, under applicable nonbankruptcy venue

provisions" the case could have been brought. 28 U.S.C. § 1409(c). Mirant, a debtor in

possession, could have sued Southern in the Georgia state court system in Fulton County, which

sits within the district encompassed by the Northern District of Georgia.[10] Therefore, the

Northern District of Georgia is a venue where the Southern Action "could have been filed." *See*

28 U.S.C. § 1404(a).

## IV.   CONCLUSION

For the foregoing reasons, The Southern Company's Motion to Transfer should be

---

[8] The choice of law issues presented by the Southern Action are complex, but one thing is clear -- Texas law does not apply. Indeed, Georgia law, Delaware law or federal law are the appropriate candidates. This factor favors transfer.

[9] This analysis is not required for transfer under § 1412.

[10] Pursuant to the Georgia Corporations Code, venue is proper in Georgia courts in Fulton County. *First*, Southern is authorized to transact business in Georgia, and it maintains its registered office in Fulton County. (Ex. C., Fleming Decl. ¶ 4.) Therefore, venue properly lies in Fulton County. O.C.G.A. § 14-2-510(b)(1) (in civil proceedings generally, venue against a foreign corporation authorized to transact business in Georgia is proper "in the county of this state where the corporation maintains its registered office"). *Second*, Southern maintains an office -- indeed its headquarters -- in Atlanta and within the Fulton County limits. Inasmuch as plaintiffs allege claims arising from conduct that occurred in Fulton County, venue is proper in Fulton County. O.C.G.A. § 14-2-510(b)(3) ("In actions for damages because of torts, wrong, or injury done, in the county where the cause of action originated, if the corporation has an office and transacts business in that county"). *Finally*, venue is also proper because Fulton County is the county in which the allegedly tortious, wrongful, and/or injurious conduct originated. O.C.G.A. § 14-2-510(b)(4).

granted and the action should be transferred to the United States District Court for the Northern District of Georgia, Atlanta Division.

Dated:  August 5, 2005                              Respectfully submitted,


                                        Gregory M. Gordon
                                        (Texas State Bar No. 08435300)
                                        Sydney B. McDole
                                        (Texas State Bar No. 13533750)
                                        Craig F. Simon
                                        (Texas State Bar No. 00784968)
                                        JONES DAY
                                        2727 North Harwood Street
                                        Dallas, Texas 75201-1515
                                        Telephone:  (214) 220-3939
                                        Facsimile:  (214) 969-5100

                                        - and -

                                        G. Lee Garrett, Jr.
                                        (Georgia State Bar No. 286519)
                                        Janine Cone Metcalf
                                        (Georgia State Bar No. 503401)
                                        JONES DAY
                                        1420 Peachtree Street, NE
                                        Suite 800
                                        Atlanta, Georgia 30309-3053
                                        Telephone:  (404) 521-3939
                                        Facsimile:  (404) 581-8330

                                        - and -

                                        Richard A. Chesley
                                        (Illinois State Bar No. 6240877)
                                        JONES DAY
                                        77 West Wacker
                                        Chicago, Illinois 60601-1692
                                        Telephone:  (312) 782-3939
                                        Facsimile:  (312) 782-8585

                                        **ATTORNEYS FOR THE SOUTHERN COMPANY**

## CERTIFICATE OF SERVICE

I certify that on this 5th day of August, 2005, a true and correct copy of the foregoing

Memorandum of Law in Support of The Southern Company's Motion to Transfer to the United

States District Court for the Northern District of Georgia was sent by first class mail, postage

prepaid to:

Frank L. Eaton, Esq.
Charles C. Kline, Esq.
Thomas E. Lauria, Esq.
White & Case LLP
Wachovia Financial Center, Ste. 4900
200 South Biscayne Boulevard
Miami, FL 33131-2350
Attorney for Debtors

Robin Phelan, Esq.
Judith Elkin, Esq.
Haynes and Boone, LLP
901 Main Street
Suite 3100
Dallas, TX 75202
Attorney for Debtors

Deborah Williamson
Thomas Rice, Esq.
Cox & Smith Inc.
112 East Pecan Street, Suite 1800
San Antonio, TX 78205-1505
Attorney for MAGI Committee

Frederic Sosnick, Esq.
Scott C. Shelley
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
Attorney for Mirant Committee

Anthony L. Cochran
Chilivis, Cochran, Larkins & Bever LLP
3127 Maple Drive, N.E.
Atlanta, GA 30305
Attorney for Elmer B. Harris, W. L.
Westbrook, and H. Allen Franklin

Bruce R. Zirinsky, Esq.
Gregory Patrick, Esq.
Cadwalader, Wickersham and Taft LLP
One World Financial Center
New York, NY 10281
Attorney for MAGI Committee

Richard W. Douglas, Esq.
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Attorney for Mirant Committee

Jason S. Brookner, Esq.
Matt Wilcox, Esq.
Andrews Kurth L.L.P.
1717 Main Street, Suite 3700
Dallas, TX 75201
Attorney for Mirant Committee

Paul N. Silverstein, Esq.
John A. Lee, Esq.
Robin Russell, Esq.
Andrews Kurth L.L.P.
600 Travis, Suite 4200
Houston, TX 77002
Attorney for Mirant Committee

George McElreath
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242

ATI-2178036v3

Richard Kuniansky
952 Echo Lane, Suite 180
Houston, TX  77024
Attorney for Elmer B. Harris, W.L.
Westbrook, and H. Allen Franklin

Richard Anderson
Burleson, Pate & Gibson, LLP
2414 N. Akard, Suite. 700
Dallas, TX  75201
Attorney for Elmer B. Harris, W.L.
Westbrook, and H. Allen Franklin

Ken Carroll
Carrington Coleman Sloman & Blumenthal,
LLP
200 Crescent Ct., Ste. 1500
Dallas, Texas  75201
Attorney for Frederick D. Kuester, Gale E.
Klappa and Stephen A. Wakefield

John G. Despriet
Smith, Gambrell & Russell, LLP
Suite 3100, Promenade II
1230 Peachtree St., N.E.
Atlanta, GA  30309-3592
Attorney for James A. Ward

_____
An Attorney for The Southern Company

ATI-2178036v3